John KELLY et al., Plaintiffs,
Ruby Sheafe et al., Plaintiffs,
and
Teresa Negron et al., Intervenor-Plaintiffs,

v.

George K. WYMAN et al.,
Defendants.

Nos. 68 Civ. 394, 864.

United States District Court
S. D. New York.

Nov. 26. 1968.
Probable Jurisdiction Noted
April 21, 1969.
See 89 S.Ct. 1469.

Lee A. Albert, Henry A. Freedman, Brian Glick, Harold J. Rothwax, David Gilman, David Diamond, Stephen Wizner, Marianne J. Rosenfield, Peter H. Darrow, Robert Sugarman, and Martin Garbus, New York City, for plaintiffs and intervenor-plaintiffs.

Mary B. Tarcher, Mort Cohen, and Louise Gruner Gans, New York City, for plaintiff Frye.

Carl Rachlin and Stephen Nagler, New York City, for plaintiffs Sheafe, and others, and intervenor-plaintiffs.

Shyleur Barrack and Richard Kwasnik, New York City, for plaintiff Lett.

Louis J. Lefkowitz, Atty. Gen., State of New York, for defendant Wyman; Joel H. Sachs, New York City, of counsel.

J. Lee Rankin, Corp. Counsel, City of New York, for defendant Goldberg; John J. Loflin, Jr., Merrill Charlton, Milton L. Platt, and Samuel Felder, of counsel.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Civil Division, Dept. of Justice, Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Laurence Vogel, Asst. U. S. Atty., of counsel.

Amicus curiae brief for the United States.

Before FEINBERG, Circuit Judge, BRYAN and McLEAN, District Judges.

FEINBERG, Circuit Judge:

These consolidated actions present another in the increasing number of attacks on prevailing state welfare practices.[1] Plaintiffs claim that the procedures in New York State for termination of welfare benefits deny due process and violate both the Social Security Act and regulations of the United States Department of Health, Education, and Welfare (HEW). The eight plaintiffs (six in one action, two in the other) are New York City welfare recipients; their complaints sought the convening of a three-judge court and declaratory and injunctive relief under the Civil Rights Act, 42 U.S.C. § 1983, and the Social Security Act, 42 U.S.C. §§ 301 et seq. Defendants are the Commissioner of the New York State Department of Social Services, the State Board of Social Welfare and the Commissioner of the New York City Department of Social Services. In May 1968, over the objections of defendants, Judge Bryan convened a three-judge court pursuant to 28 U.S.C. §§ 2281, 284. 294 F.Supp. 887 (S.D.N.Y.1968). Thereafter, a briefing schedule was fixed and hearings were held in June and July on a number of motions. Because of the interest of the United States in the monies expended under New York State and City welfare programs and in the procedures set up to administer them, the court invited the United States to submit an amicus brief, which it did in early October 1968. For reasons hereafter indicated, we grant plaintiffs' motion for a preliminary injunction in part and deny it in part, and deny defendants' motion for summary judgment; the disposition of other motions is set forth in detail below.

I

Welfare programs in the United States generally fall into two groups: general assistance and categorical assist-

---

1. See, e. g., King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn. 1967), argued, 36 U.S.L.W. 3425 (U.S. May 7, 1968), reargued, 37 U.S.L.W. 3157 (U.S. Oct. 29, 1968), (No. 813, 1967 Term; renumbered No. 9, 1968 Term); Parrish v. Civil Serv. Comm'n, 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223 (1967).

ance.[2] The former is financed only by state and local governments; the latter refers to programs supported by grants from the federal government under the Social Security Act to give aid to particular categories of individuals, e. g., aid to families with dependent children (AFDC). Four of the original plaintiffs in this action [3] were recipients of general assistance, home relief under the New York Social Welfare Law. The other four [4] were recipients of AFDC, which New York State administers in accordance with the Social Security Act, 42 U.S.C. §§ 601–609. Funds of the United States are involved only in the latter program.

It is instructive on the state of administration of public welfare to review how both federal and New York State and City regulations have changed just since the institution of this consolidated action. At the time the complaints were filed, state regulations dealing with both home relief and AFDC programs apparently required no *prior* notice at all of suspension of benefits and no hearing *prior* to that action. However, a state hearing procedure, which is designated as a "fair hearing," had been instituted to provide an administrative remedy *after* suspension or termination of benefits; in the case of home relief, the procedure went into effect barely two weeks before the first complaint was filed in this case. After the action began, the State Department of Social Services amended its regulations, effective March 1, 1968, to provide notice and an "administrative hearing" *before* termination of public assistance. Thereafter, apparently because the New York City Department of Social Services felt that it could not feasibly comply with that regulation, it was repealed, and a

new regulation was adopted. Under it, welfare departments may choose one of two options described below, both of which continue to provide notice and a type of hearing before cessation of benefits. Subsequent to the State amendments, HEW adopted a new criterion for the administration of state plans, effective July 1, 1968, which requires that the agency:

> Gives advance notice of questions it has about an individual's eligibility so that a recipient has an opportunity to discuss his situation before receiving formal written notice of reduction in payment or termination of assistance.

Handbook of Public Assistance Administration, Part IV, § 2300(d) (5) (1968) ("Handbook").

The remedies for a welfare recipient who has been wrongfully suspended or terminated have also been changed in another significant respect. At the time the suit was commenced, New York granted a reinstated recipient retroactive benefits for only two months and then only to the extent of debts for necessities which had been incurred.[5] Since the delay between wrongful termination of benefits and subsequent reinstatement often exceeded two months, the limit on retroactivity worked hardship. However, effective July 1, 1968, pursuant to a change in regulations issued by HEW, payments are now made fully retroactive and are not confined to reimbursement for debts incurred.[6]

As a result of these changes, welfare recipients in New York State now have a two-step procedure to protect them against allegedly wrongful termination or suspension of benefits. The first, or pre-termination procedure, depends upon which of two options the local welfare

2. See Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84 (1967).

3. John Kelly, Randolph Young, Juan De-Jesus and Ruby Sheafe.

4. Pearl McKinney, Pearl Frye, Altagracia Guzman and Esther Lett. Twelve additional plaintiffs also sought to intervene.

Of these, 10 were also in the AFDC program, and 2 received home relief only.

5. See 18 NYCRR 325.5(n) (5) (superseded 1968).

6. See Handbook, Part IV, §§ 6200(k), 6300 (g) (1968); 18 NYCRR 325.5(n) (6), as amended (Order of New York State Dept. of Social Services, June 28, 1968).

agency has adopted. We are advised that in New York State, option (a) is in effect everywhere but in New York City, which has chosen to follow option (b). Both options are set forth in the margin.[7] Under option (a), the local

7. Proposed discontinuance or suspension of grant; prior notice to recipient; additional local review and subsequent determination. When a social services official proposes to discontinue or suspend a grant of public assistance he shall proceed in accordance with the provisions of either subdivision (a) or (b) below:

(a) He shall notify the recipient in writing of his intention to discontinue or suspend the grant at least seven days prior to the proposed effective date of the discontinuance or suspension, together with the reasons for his intended action, unless such discontinuance or suspension is in response to the request of the recipient or is due to: the death of the recipient who is an unattached person; the recipient's admission to an institution wherein his assistance may not be continued; the recipient's whereabouts being unknown to the social services official because the recipient moved from his last known address without notifying the social services official and without leaving a forwarding address; the recipient's moving from the state and establishing his permanent home elsewhere; the recipient's case having been reclassified as to category. Such notification shall further advise the recipient that if he makes a request therefor he will be afforded an opportunity to appear at the time and place indicated in the notice before the person identified therein who will review his case with him and will afford him opportunity to present such written and oral relevant evidence and reasons as the recipient may have to demonstrate why his grant should not be discontinued or suspended, and that the recipient may appear and present such evidence and reasons on his behalf with or without the assistance of an attorney or other representative. Only the social services official or an employee of his social services department who occupies a position superior to that of the supervisor who approved the proposed discontinuance or suspension shall be designated to make such a review. When a recipient requests such a review the designated person shall, at the time and place indicated in the notice to the recipient, review with the recipient and his representative, if any, the evidence and reasons supporting the proposed action and shall thereupon afford the recipient opportunity to present relevant evidence and to state reasons why the proposed discontinuance or suspension should not be made. When such a review

has been made by a designated employee, such employee shall promptly make an appropriate written recommendation to the social services official, together with his reasons therefor, including reference to applicable provisions of law, Board rules, Department regulations, and approved local policy. After such a review the social services official shall expeditiously determine whether the proposed discontinuance or suspension shall or shall not be made effective as proposed, after considering all the evidence before him and the recommendation, if any, of the employee designated by him to review the proposed action with the recipient. The social services official shall then promptly send an appropriate written notice of his decision to the recipient and his representative, if any, and to the Department's area office. Assistance shall not be discontinued or suspended prior to the date such notice of decision is sent to the recipient and his representative, if any, or prior to the proposed effective date of discontinuance or suspension, whichever occurs later.

(b) A social services official may adopt a local procedure concerning discontinuance or suspension of grants of public assistance and submit to the Department such procedure for its approval. Upon approval such local procedure shall become effective. Such local procedure must include the following:

(1) Notice to the recipient of proposed discontinuance or suspension of the grant at least seven days prior to the proposed effective date of the discontinuance or suspension, together with the reasons for the intended action, unless such discontinuance or suspension is in response to the request of the recipient or is due to: the death of the recipient who is an unattached person; the recipient's admission to an institution wherein his assistance may not be continued; the recipient's whereabouts being unknown to the social services official because the recipient moved from his last known address without notifying the social services official and without leaving a forwarding address; the recipient's moving from the state and establishing his permanent home elsewhere; the recipient's case having been reclassified as to category.

(2) The notice must advise the recipient that, if he so requests, the proposed discontinuance or suspension will

agency must give seven days written notice, specifying the reasons for suspension, before aid is stopped. The recipient is entitled to appear before an official, who is superior to the one who approved the suspension, and can present oral and written evidence with the aid of an attorney or other representative. Option (b), adopted by New York City, offers less procedural protection; e. g., although the notice provision is the same, the welfare recipient is entitled to submit a statement in writing to demonstrate why aid should continue. Under either option, if the recipient is unsuccessful, benefits cease. Thereafter, the terminated recipient is entitled to the second step, the so-called state "fair hearing," [8] which spells out significant procedural rights and is a trial-type proceeding. Thus, that hearing is before an independent state hearing officer; the complaining recipient has the right of confrontation and cross-examination of the witnesses against him; and a verbatim record is made of the hearing. The state regulations provide that the state fair hearing is to be held within ten working days of receipt of a request for the hearing, and a decision is to be rendered as soon as feasible, and, in any event, not later than twelve working days from the close of the hearing.[9]

## II

Plaintiffs allege that even with the improved procedures, they are threatened with termination of assistance in a manner that is both unconstitutional and improper under the governing statute and regulations. Their constitutional argument is that under the due process clause of the fourteenth amendment they are entitled to a constitutionally adequate hearing before termination of benefits and that the procedures provided by the state and city do not meet this standard. Defendants do not deny plaintiffs' general propositions that the terminations here under attack amount to "state action" and that the protections of the due process clause apply. Nor do defendants attempt to argue that welfare benefits are a "privilege," rather than a right, and that therefore they may fix the procedures of termination as they see fit.[10] However, defendants do claim that the combined hearing procedures now provided to welfare recipients meet constitutional and statutory requirements.

We agree with defendants that the state fair hearing procedure after termination of benefits seems constitution-

be reviewed and he may submit in writing a statement or other evidence to demonstrate why his grant should not be discontinued or suspended.

(3) A review of the proposed discontinuance or suspension shall be made by the social services official or an employee of his social services department who occupies a position superior to that of the supervisor who approved the proposed discontinuance or suspension.

(4) After review of the relevant materials in the recipient's file including any written material submitted by him the decision shall be made expeditiously as to whether the proposed discontinuance or suspension shall or shall not be made effective as proposed. Appropriate written notice of the decision shall be sent to the recipient and to the Department's area office. Assistance shall not be discontinued or suspended

prior to the date such notice of decision is sent to the recipient and his representative, if any, or prior to the proposed effective date of discontinuance or suspension, whichever occurs later. 18 NYCRR 351.26.

8. 18 NYCRR 84.2.23.

9. We are advised by the amicus brief of the United States that HEW has found that the new state "fair hearing" plan is not acceptable, as it fails to comply with federal standards, see Handbook, Part IV, §§ 6000–6500 (1968), in several respects, but that New York is in the process of revising the plan to meet federal requirements.

10. Cf. C. Reich, The New Property, 73 Yale L.J. 733 (1964); W. Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968).

ally sufficient.[11] Defendants argue that combining the post-termination procedure with an informal pre-termination "hearing" disposes of all due process claims, citing principally Wheeler v. Montgomery, 296 F.Supp. 138 (N.D.Cal. 1968) (three-judge court), appeal docketed, 37 U.S.L.W. 3152 (U.S. Oct. 22, 1968) (No. 634). In that case, as in this, state hearing procedures for termination of welfare changed during the litigation. There, the state provided an "informal conference" before termination and a full hearing procedure within a few months thereafter. The court determined the constitutionality of the former "in light of" the latter and held that the combined procedure complied with due process.[12]

While post-termination review is relevant, there is one overpowering fact which controls here. By hypothesis, a welfare recipient is destitute, without funds or assets. The case of Angela Velez, one of the proposed intervenors, makes the point starkly. She was terminated on March 11, 1968, because her husband allegedly visited her home every night. She requested the post-termination state fair hearing in mid-March. The hearing was held in June, and, pursuant to the request of this court for expedition, the decision issued on July 10. The State Commissioner found that the information that caused suspension of benefits came from Mrs. Velez's landlady, that the information was untrue, that the husband does not live with his wife, that she had obtained a court order in 1966 to prevent his night visits, that he is allowed to visit the four small children only on Wednesday, and that at that time he brings his support money of $30 a week, but no more, in accordance with an agreement worked out in Family Court. Accordingly, the State Commissioner directed the local agency to reinstate assistance. However, in the four months between termination of AFDC benefits and the decision reversing the local agency, Mrs. Velez and her four children, ages one to six, were evicted from her apartment for nonpayment of rent and went to live with her sister, who has nine children and is on relief. Mrs. Velez and three children have been sleeping in two single beds in a small room, and the youngest sleeps in a crib in the same room. Thirteen children and two adults have been living in one apartment, and Mrs. Velez states that she has been unable to feed her children adequately, so that they have lost weight and have been ill.

The case of Mrs. Esther Lett, one of the original plaintiffs, is also instructive. According to the affidavits of plaintiff Lett and her Legal Aid Society attorney: She and her four dependents, aged three months to fifteen years, were abruptly terminated from public assistance on February 1, 1968. The purported ground was that she had concealed her current employment by the Board of Education. In fact, she had worked for Operation Head Start in July and August 1967, but had not been employed by the Board of Education after August 20, 1967. Since that date and up to February 1968, she had worked at Day Care Centers on twenty-six different days, earning a total of $300, with the knowledge of the local welfare agency. As a result of termination of assistance, she and her dependents were forced to live on the handouts of neighbors. On February 18, she and her family had to go to the hospital for severe diarrhea, apparently brought on by the only meal they had had that day—spoiled chicken and rice donated by a neighbor. She applied for emergency aid and a post-

11. Although one of the United States' objections to this procedure, see note 9 supra, is that it fails to provide specifically that the hearing officer's decision must be based only upon evidence which is a part of the record, for constitutional purposes we would construe the regulations, see 18 NYCRR 84.15(a), to include such a requirement, in accordance with this opinion.

12. Apparently a California state court disagreed with the California federal court. See McCullough v. Terzian, No. 379011 (Cal.Super.Ct., Alameda County, May 1968).

termination state "fair hearing" but the aid was refused and the fair hearing was not scheduled. Through the herculean efforts of The Legal Aid Society, including numerous telephone calls and three personal trips to local agencies, it was learned that the Board of Education had apparently made an error. However, the Board would not so inform the welfare agency until it requested a new verification. On Tuesday, February 27, Mrs. Lett went to a local center to seek emergency aid. Because she had not eaten all day, she fainted in the center, but when she awoke she was told that she could not get money for food immediately because it had not yet been authorized. Finally, after waiting eight hours, she was given $15 to feed herself and four dependents and told to return on Friday. After suit was brought, her assistance was apparently temporarily reinstated without prejudice.

We do not know what the truth is with regard to Mrs. Lett's alleged concealment of employment, although on the present record it appears that the termination of benefits was improper.[13] As for Mrs. Velez, it is clear that the decision to terminate her payments was wrong. But the issue is not whether a specific termination was proper, but whether the procedures used were justifiable. There is no need to elaborate with further case histories. Suffice it to say that to cut off a welfare recipient in the face of this kind of "brutal need"[14] without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it. Traditionally, such considerations have been urgent in nature and involve the health, safety, or well-being of many individuals. "Drastic administrative action is sometimes essential to take care of problems that cannot be allowed to wait for the completion of formal proceedings." 1 K. Davis, Administrative Law Treatise ¶ 7.08, at 438 (1958), citing cases where great harm to the public was, or could be, immediately threatened.[15]

We turn then to examine the pressing need here that would justify a departure from the general standard of "the requisite [due process] hearing * * * before the final order becomes effective."[16] Simply stated by defendant New York City Commissioner, it is the "need to protect the public's tax revenues." This is, of course, not only a legitimate, but a necessary, concern of defendants, but the argument requires close analysis. Clearly, the state must see to it that assistance goes only to those who are entitled to it. However, the issue here affects only the continuation of benefits while a claim of ineligibility is disputed. Defendants' asserted justification for the termination procedures now being used is therefore quite narrow. It is the additional cost of providing more elaborate procedures to determine whether the tentative decision to terminate benefits was correct, a cost which may come both from an increase in the number of hearings and from an extension of average time from notice of termination to end of hearing, during which period benefits continue. It is clearly within the power of the state and city to minimize that additional cost by various methods, e. g., by expediting hearings, by increasing the number of hearing officials, by utilizing statutory rights to recover monies paid since the date of ineligibility. Cf. Snell v. Wyman, 281 F.Supp. 853 (S.D.N.Y.), appeal docketed, 393 U.S. 813, 89 S.Ct. 106, 21 L.Ed.2d 89 (1968). Moreover, it should be remembered that, insofar as AFDC

13. Benefits to Mrs. Lett had also been suspended during March 1967; the suspension was found to be improper in a fair hearing decision in November 1967.

14. See Note, Withdrawal of Public Welfare: The Right to a Prior Hearing, 76 Yale L.J. 1234, 1244 (1967) ("Yale Note").

15. E. g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (mislabeled food products); Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (summary seizure of savings and loan association by conservator). See also cases cited in Yale Note 1240–41 nn. 26–35.

16. Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 152–153, 61 S.Ct. 524, 536, 85 L.Ed. 624 (1941).

or other categorical assistance is concerned, federal contributions are available to meet fifty per cent of the cost of benefits paid pending review and the administrative expense of the hearing procedures. See Handbook, Part IV, § 6500 (1968).

■ Against the justified desire to protect public funds must be weighed the individual's overpowering need in this unique situation not to be wrongfully deprived of assistance, and the startling statistic that post-termination fair hearings apparently override prior decisions to terminate benefits in a substantial number of cases.[17] The obvious fact is that there is no way truly to make whole a recipient like Mrs. Velez for the indignity of living with her sister and thirteen children in one apartment because of a wrongful termination. The equally obvious remedy is to take greater care to prevent such injustice before it occurs. While the problem of additional expense must be kept in mind,[18] it does not justify denying a hearing meeting the ordinary standards of due process.[19] Under all the circumstances, we hold that due process requires an adequate hearing before termination of welfare benefits, and the fact that there is a later constitutionally fair proceeding does not alter the result.[20] In short, we must focus on the adequacy of the hearing procedures which defendants have provided prior to termination of benefits.

### III

Cases dealing with procedural requirements of a hearing before an administrative tribunal are many and varied, involving such diverse administrative actions as discharge from public employment,[21] refusal to license,[22] revocation

17. Thus, it appears from the state wide figures submitted by defendants that in the fair hearings on discontinuance which reached decision from April through August of this year, only 50 of 78 cases, or 64%, were affirmed. Seventeen were reversed in whole, 1 in part, 3 remanded, and 7 received "miscellaneous" dispositions. Later figures for September and October, just submitted by defendants, show a higher percentage of affirmances.

18. It has been noted that "the welfare system is designed to save money instead of people, and tragically ends up doing neither." David Ginsburg, Exec. Dir. Nat'l Advisory Comm'n on Civil Disorders, 23 Record of N.Y.C.B.A. 28 (Supp.1968), quoting Mitchell Ginsberg, former head of New York City's Department of Welfare.

19. Cf. D. Morris, Welfare Benefits as Property: Requiring a Prior Hearing, 20 Admin.L.Rev. 487, 506 (1968): "The state interest which circumscribes the property interest of a welfare recipient and also affects the type of procedural due process afforded is not the state's interest in its funds, but only whether the funds themselves accord with the aims of society."

20. We note, in this context, that the United States indicates that HEW is presently considering adoption of a policy by which assistance would continue until a fair hearing decision was reached in at least some types of termination cases. This consideration, along with the present federal requirement of advance notification and opportunity for discussion, see text preceding note 5 supra, reinforces our expectation that providing adequate prior hearings will not unduly burden the administration of the welfare system.

Of course, we do not suggest that the same procedures are constitutionally requisite in all forms of social security administration. In the operation of the federally-administered Old-Age, Survivors, and Disability Insurance program, for example, the amicus brief indicates that no hearing prior to termination is available as of right. However, as that brief points out, there are far fewer reasons for termination of OASDI benefits than in the AFDC program, and these reasons are based on more objectively ascertainable facts. In OASDI the circumstantial changes on which termination is based are nearly always reported or confirmed by the recipient himself, and the likelihood of severe hardship resulting from erroneous termination is certainly not as great as in the welfare programs here in issue.

21. Slochower v. Board of Higher Educ., 350 U.S. 551, 554, 76 S.Ct. 637, 100 L.Ed. 692 (1956); cf. Parker v. Lester, 227 F.2d 708 (9th Cir. 1955).

22. Bratton v. Chandler, 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157 (1922); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964).

of security clearance,[23] treatment of aliens,[24] and admission to the bar,[25] to name only a few. Before considering plaintiffs' formidable list of objections to the pre-termination hearing procedures afforded welfare recipients, some observations based upon these and related cases may be in order.

■ 1. It is impossible to define rigidly what constitutes procedural due process for all purposes. "[D]ue process of law has never been a term of fixed and invariable content." FCC v. WJR, 337 U.S. 265, 275, 69 S.Ct. 1097, 1103, 93 L.Ed. 1353 (1949). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria Workers Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

"Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. * * * [A]s a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.

Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960).

■ 2. While it is a well established principle that courts should not decide issues of procedural deficiency on constitutional grounds if any other avenues of decision are open, see Greene v. McElroy, 360 U.S. 474, 509, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (concurring opinion); Ashwander v. TVA, 297 U.S. 288, 346–347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion), we believe that the constitutional issue must be faced here. It is true that plaintiffs not only invoke due process but also rely on the requirement of the Social Security Act, 42 U.S.C. § 602(a) (4) that:

A State plan for aid and services to needy families with children must * * * (4) provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for aid to families with dependent children is denied or is not acted upon with reasonable promptness * * *.[26]

By interpreting the statutory phrase "fair hearing" in the context of pre-termination procedures,[27] we might have avoided the constitutional questions. See Greene v. McElroy, 360 U.S. 474, 496–497, 507–508, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). However, the command of the federal statute does not apply to state and local general assistance, for which no federal funds are provided. Six of the original and intervening plaintiffs[28] receive such assistance only; as to them the constitutional issue is squarely posed.

■ 3. We must thus decide what specific procedural safeguards are constitutionally required for welfare recipients in a pre-termination proceeding. While the Supreme Court has been solicitous to assure "traditional forms of fair procedure" in administrative hearings, Greene v. McElroy, supra, 360 U.S. at 508, 79 S.Ct. 1400, we do not believe that every person directly affected

23. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1958).

24. Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

25. Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963). See also Goldsmith v. U.S. Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926).

26. Cf. 42 U.S.C. §§ 302(a) (4), 1202(a) (4), 1352(a) (4), 1382(a) (4).

27. See recent HEW regulation quoted in text preceding note 5 supra.

28. See notes 3, 4 supra and accompanying text.

by administrative action must be afforded all of the procedural rights guaranteed in a full-fledged judicial trial. See, e. g., Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); cf. Hyser v. Reed, 318 F.2d 225 (D.C. Cir.), cert. denied, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963). Rather, we are called upon to determine what minimum procedural safeguards are required here in the context of the welfare system.

### IV

We turn first to the procedures provided under option (b) which is in effect in New York City. Option (b) provides for notice of "proposed discontinuance or suspension * * * together with the reasons for the intended action," and allows the recipient in response only to "submit in writing a statement or other evidence to demonstrate why his grant should not be discontinued * * *." The option does not envisage a personal appearance.

 A hearing on a proposed termination of welfare benefits is, of course, a classic instance of determination of what have been called "adjudicative facts—facts pertaining to a particular party." 1 K. Davis, Administrative Law Treatise ¶ 7.20, at 506 (1958). If the right to a hearing in this context, fairly construed, means anything, it is literally the right to be heard. This is hardly a novel idea. In Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), the Supreme Court specifically rejected the notion that permission to submit objections in writing comported with due process, and concluded that "a hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof,

however informal." 210 U.S. at 386, 28 S.Ct. at 714. See also Goldsmith v. U. S. Board of Tax Appeals, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926). We do not deal here with the issue whether procedural due process requires the right to oral argument on a matter of law. See FCC v. WJR, 337 U.S. 265, 276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949). We have the different question whether a welfare recipient has the right to appear in person before the welfare agency to present his case. On an issue of such immediate and crucial impact as termination of welfare benefits, we conclude that the right to be heard means the right to be heard in person. Defendants cite to us Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), and Boston & Maine R. R. v. United States, 208 F. Supp. 661 (D.Mass.), aff'd mem., 371 U.S. 23, 83 S.Ct. 117, 9 L.Ed.2d 95 (1962). It is true that *Morgan* contained the dictum that "[a]rgument may be oral or written," 298 U.S. at 481, 56 S.Ct. at 912, but we do not take that to mean that in this case there is no constitutional right to present evidence, as opposed to argument, in person. Moreover, the case is clearly distinguishable on its facts.[29] In *Boston & Maine*, plaintiffs had had "a full opportunity to present their defense by oral and documentary evidence." 208 F.Supp. at 667.

Not only is the right to a personal appearance ordinarily implicit in the constitutional concept of a fair hearing, but the reality of the status of many welfare recipients makes the invitation to submit their cases in writing cruelly ironic. The burden of marshalling and writing down persuasive arguments in opposition to frequently vague or cryptic charges would discourage even a relatively well-educated layman. In fact, many welfare recipients clearly lack the education or sophistication either to understand the

---

29. *Morgan* was a challenge to administrative rate making; plaintiffs had had the opportunity to present oral argument on evidence before the agency in question; and the holding of the case was that decision could not be made by an officer who had not considered the evidence or argument. As to the subsequent treatment of *Morgan*, see W. Gellhorn & C. Byse, Administrative Law 1086–89 (4th ed. 1960).

reason for their proposed termination or to prepare an adequate written defense.[30] Moreover, a review of the cases of the individual plaintiffs in this action is persuasive that many of the disputes as to eligibility could have been easily resolved by an interchange of questions and answers between the recipient and the welfare official supervising the case. In the case of Mrs. Lett, for instance,[31] a conference about the facts of her employment with an impartial official might have quickly cleared up the misunderstanding and prevented the severe hardships that she suffered. Certainly the give and take of an informal hearing would be more likely to produce a just disposition than an attempt on her part to furnish a written rebuttal of her alleged "failure to disclose assets."

Even if the majority of welfare recipients were educationally equipped to write a clear statement of the reasons why they should not be terminated, the very summary form of notice of proposed terminations makes an intelligent reply difficult.[32] Not only are the reasons given often incomprehensibly vague, but additional or wholly different reasons may in fact be behind the decision to terminate.[33] A personal hearing is necessary, if the recipient wishes it, both to explain to him the nature of the charges against him and to inform him of the evidence on which they are based. Indeed, the next most glaring deficiency of option (b) is its failure to require disclosure to the recipient of the real basis of the case against him. It merely provides for notice of proposed discontinuance "together with the reasons for the intended action." This procedure clearly falls far short of giving the recipient sufficient notice of the case against him so that he may ascertain its basis and contest it effectively. In Willner v. Committee on Character and Fitness, 373 U.S. 96, 107, 83 S.Ct. 1175, 1182, 10 L.Ed.2d 224 (1963), the concurring opinion of Justices Goldberg, Brennan and Stewart states:

> The constitutional requirements in this context may be simply stated: in all cases in which admission to the bar is to be denied on the basis of character, the applicant, at some stage of the proceedings prior to such denial, must be adequately informed of the nature of the evidence against him and be accorded an adequate opportunity to rebut this evidence.

At least seven, if not all,[34] of the Justices agreed with this statement.

The stakes are simply too high for the welfare recipient, and the possibility for honest error or irritable misjudgment too great, to allow termination of aid without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evi-

---

30. A recent study has established that only 57% of the mothers on welfare in New York City had attended high school at all; that only 1 of 6 had graduated; and that 1 of 6 had not even gone beyond fourth grade. See I. Cox, Families on Welfare in New York City, 6 Welfare in Review 22, 24 (1968).

31. See text preceding note 13 supra.

32. The charge of "failure to comply with Department resource policy" made to intervenor-plaintiff Sidor, for example, is virtually impossible to disprove without further information.

33. The cryptic notice given intervenor-plaintiff Soto, for example, was "failure to attend rehabilitation C.O.C." The decision of the review officer, however, refers to quite different reasons—that Mr. Soto took drugs, was reported to be "a parasite" and "playing a game," and had frequently failed to cooperate.

34. The dissenting opinion (Harlan, J., joined in by Clark, J.) held that the petition for certiorari should have been dismissed as improvidently granted, but characterized as "questionable" any holding that "an applicant for membership in the New York Bar may be denied admission without having had the opportunity at any stage to confront persons whose unfavorable information may have led the Character Committee to refuse to certify the candidate's 'character and fitness.'" 373 U.S. at 110, 83 S.Ct. at 1183.

dence in rebuttal.[35] Moreover, in some instances at least, he must be permitted to meet the evidence against him by having questions put to the source of that evidence. There have been cited to us too many case histories in which welfare recipients have allegedly been cut off on the basis of untrue rumors and reports, as with Mrs. Velez, discussed above. We do not hold that the welfare recipient about to be terminated must be accorded the opportunity for confrontation and cross-examination in a formal manner, with the full panoply of a trial-type hearing, including testimony under oath. The right to face those providing harmful information and have them interrogated may be substantially achieved in an informal way, and we use the term "cross-examination" here in that less formal sense. Moreover, we are aware that such a requirement is time-consuming and if applied indiscriminately in every case might unduly delay administration of the entire welfare system. There will undoubtedly be many cases—perhaps a great many—in which the material relied upon by the welfare agency "appears from information supplied or confirmed by the applicant himself, or is of an undisputed documentary character disclosed to the applicant * * *." Willner v. Committee on Character and Fitness, 373 U.S. 96, 108, 83 S.Ct. 1175, 1182, 10 L.Ed.2d 224 (1963) (concurring opinion).[36] But where termination of benefits "depends upon information supplied by a particular person whose reliability or veracity is brought into question by the applicant, confrontation and the right of cross-examination should be afforded." Id.[37] It may be that something less would be appropriate in such a case if the welfare authorities could show an important interest in secrecy, cf. McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), but no such interest has been demonstrated in any of the cases before us. We assume that any such situation would be the rare exception to be justified on the particular facts involved. We do not suggest that a "tip" or other confidential information may not properly trigger an investigation of a welfare recipient's eligibility. We hold only that when the decision is made to terminate benefits, the recipient must be afforded an opportunity to learn the evidence against him which the investigation turned up, if it was a basis of that decision, and when the value of that evidence turns upon a person's credibility, the recipient must have the opportunity to test it as set forth above. We realize that these requirements will duplicate the "fair hearing" post-termination procedure to some extent. However, any pre-termination hearing—even the type already put into effect by the state—also does that. Undue duplication is of course regrettable. However, we regard the informal conference envisioned here as quite different from a full-fledged trial-type post-termination "fair hearing" with testimony given under oath. In any event, in light of the shattering effect of wrongful termination of benefits up-

35. See Bratton v. Chandler, 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157 (1922); Gonzales v. United States, 348 U.S. 407, 415, 75 S.Ct. 409, 99 L.Ed. 467 (1955); Dixon v. Alabama State Bd. of Educ., 294 F. 2d 150, 159 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Parker v. Lester, 227 F.2d 708, 716–717 (9th Cir. 1955).

36. Intervenor-plaintiff Fuentes, for instance, was given notice of termination because "You have a large sum of money in the bank for which you were unable to give a satisfactory explanation." In such a case, an official statement from the bank would ordinarily be adequate to support the agency's claim. Again, the issue may be simply the proper application of agency regulations to an undisputed factual situation.

37. See Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Gonzalez v. Freeman, 118 U.S. App.D.C. 180, 334 F.2d 570, 578–580 (D.C.Cir.1964); Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964); Rios v. Hackney, 294 F.Supp. 885 (N.D.Tex. 1967). But cf. Brown v. Gamage, 126 U.S.App.D.C. 269, 377 F.2d 154 (D.C.Cir.), cert. denied, 389 U.S. 858, 88 S.Ct. 103, 19 L.Ed.2d 125 (1967), criticized in 20 Stan.L.Rev. 360 (1968).

on a recipient, we believe that the procedures called for here are minimum requirements of due process.

■ Accordingly, therefore, we conclude that option (b) is constitutionally inadequate and that plaintiffs' application for a preliminary injunction against the use of the option in New York City must be granted. However, because argument has also been addressed to the legal sufficiency of the provisions of option (a) and because New York will be faced under our ruling with the need to substitute for option (b), we feel it is our obligation also to consider the constitutionality of procedures under option (a).

That option states that the notice of proposed termination shall advise the recipient that if he makes a request for review he will be afforded:

opportunity to present such written and oral relevant evidence and reasons as the recipient may have to demonstrate why his grant should not be discontinued or suspended, * * *

and at such a review, the designated welfare official shall:

review with the recipient and his representative, if any, the evidence and reasons supporting the proposed action and shall thereupon afford the recipient opportunity to present relevant evidence and to state reasons why the proposed discontinuance or suspension should not be made.[38]

This language makes clear that option (a) does not suffer from some of the obvious inadequacies of option (b). Thus, option (a) does provide for a hearing in person, and, fairly construed, for

disclosure to the recipient of the evidence against him. It is not clear whether the source of the evidence must be identified and the recipient thereafter given the right, in an appropriate case, to confront a person so disclosed and have him questioned. The regulation's silence on this point, when compared with the specificity of the state hearing procedure provided after termination,[39] might indicate that the recipient is denied such right. We have already ruled that this would be constitutionally invalid. Therefore, unless option (a) is construed to afford a recipient such right in an appropriate case, the procedure is improper. But in view of the newness of the regulation and the paucity of information given us on its use outside of New York City, we will not assume at this time that the right will be denied.

■ Plaintiffs have other objections to option (a), but to the extent that they have not already been dealt with, they do not require extensive discussion.[40] Implicit in what we have already said is the requirement that the decision of the reviewing official must be based solely on evidence before him which has been made available to the recipient, except in the rare instance already discussed when there is an important interest in secrecy.[41] An objection is made to the notice requirement, but it is not persuasive. Option (a) requires notice in writing "at least 7 days prior to the proposed effective date of the discontinuance." We construe this to mean that the notice must be mailed at least seven days before such effective date. If so mailed, the notice is adequate.

38. See note 7 supra.

39. "Each party has a right to be represented by counsel, or other representative, to testify, to produce witnesses to testify, to offer documentary evidence, to cross-examine opposing witnesses, to offer evidence in rebuttal and to examine any documentary evidence offered by the other party." 18 NYCRR 84.13(c).

40. HEW is apparently seeking clarification at this time from the New York Welfare

Department on the grounds that the New York prior review procedure is not expressly available in cases of reduction of benefits as well as termination, as is required by the Handbook, Part IV, § 2300 (d) (5) (1968). Since plaintiffs have not raised this issue, we do not consider it here.

41. See text following note 37 supra.

The final objection to option (a) as written is that the welfare official reviewing the proposed termination of benefits is not impartial. Option (a) provides that:

> Only the social services official or an employee of his social services department who occupies a position superior to that of the supervisor who approved the proposed discontinuance or suspension shall be designated to make such a review.

This is obviously an attempt to have "review" of a supervisor's decision to terminate by someone more disinterested than he is. Since the review, however, is by another employee of the welfare agency, there is a possibility that the reviewing official will have had some prior official contact with the case. However, we. are unable to say that the possible involvement of that official in aspects of a case prior to the review of proposed termination necessarily disqualifies him from conducting a fair hearing. Some degree of previous familiarity and informal contact with a case by a hearing officer is a common phenomenon in many administrative agencies. That the review officer is familiar with, or even has formulated opinions about, the facts of a case prior to review is not in itself sufficient to disqualify him.[42] However, plaintiffs argue that this reviewing officer is in practice frequently a case supervisor who has been consulted in advance for approval of proposed terminations and may even have initiated the recommendation to terminate. We would regard such a practice as a clear violation of the spirit of the requirement that the reviewing officer be superior to "the supervisor who approved the proposed discontinuance." In other words, the regulation meets the requirement of a fair hearing, but we expect the welfare department to enforce it strictly.[43]

In addition to their allegations of the insufficiency of the New York hearing procedures on their face, plaintiffs complain that the regulations themselves are frequently disregarded or improperly applied. They have offered evidence showing, for instance, that the notice often is not sent out within seven days of the proposed termination or before termination at all, that notices fail to state the full or real reasons for proposed termination, and that the review decision is frequently delayed unduly. We recognize that the transition to a new system of procedures, especially in an agency as large as the New York City Welfare Department, is not an easy task, and that it necessarily takes time to achieve full and smooth operation. Moreover, we are confident that the agency will make every effort in the future to insure that its own regulations and the requirements outlined in this opinion are carefully observed in practice. Finally, we are well aware that proceedings to compel state officials to comply with their statutory or regulatory duties should usually be brought in state courts,[44] and that supervision of a state administrative program is ordinarily an inappropriate role for a three-judge federal court. In view of all of these considerations and the fact that the plaintiffs before us are obtaining an injunction against use of option (b), the procedure which has been applicable to their terminations up to now, we will not now deal with these issues further.

42. See NLRB v. Donnelly Garment Co., 330 U.S. 219, 236–237, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947): "We find no warrant for imposing upon administrative agencies a stiffer rule, whereby examiners would be disentitled to sit because they ruled strongly against a party in the first hearing." See also Pangburn v. CAB, 311 F.2d 349, 356–358 (1st Cir. 1962); 2 K. Davis, Administrative Law Treatise ¶ 12.06, at 169 (1958); W. Gellhorn & C. Byse, Administrative Law 944–45 (4th ed. 1960).

43. We also assume that a case supervisor who has become too deeply involved in a case conscientiously to undertake an impartial review can and will disqualify himself from that function.

44. For instance, in an Article 78 proceeding in New York, N.Y.C.P.L.R. §§ 7801–7806.

V

■ With this disposition of the case, it is unnecessary to rule on plaintiffs' remaining statutory argument that by providing two options throughout the state for pre-termination procedure, the state violates the requirement of 42 U.S.C. § 602(a) (1), that its plan, in effect, be uniform in the state. Apparently, defendants do not press before us various other arguments originally made before Judge Bryan, such as plaintiffs' need to exhaust available remedies administratively, or that the case is moot because most plaintiffs are now receiving public assistance on an emergency basis, or that a three-judge court is inappropriate here. Judge Bryan rejected these arguments in his opinion convening the three-judge court. 294 F.Supp. at 887.

■ As to the first argument, see King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). As to the second argument, the only development since Judge Bryan's decision is that some of these plaintiffs have received their post-termination state fair hearings. However, that this right was finally accorded to them months after their complaint was filed and after termination of benefits does not dispose of. the case. Other plaintiffs are still threatened with termination without a proper hearing, and if we were required to do·so, we would regard this as a class action, as plaintiffs request, as was done in Wheeler v. Montgomery, No. 48303 (N.D.Cal. April 17, 1968), appeal docketed, 37 U.S.L.W. 3152 (U.S. Oct. 22, 1968) (No. 634), relied on by defendants. Finally, Judge Bryan properly convened the three-judge court. The complaint obviously raised substantial constitutional issues. In addition, while option (b) may thus far have actually been in effect only in New York City, any or all local agencies could adopt it; it is thus validly a regulation of "general

and state wide application." Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

Finally, we emphasize again that we deal here only with procedural rights, not with whether a particular recipient of welfare is entitled to receive it. We are most aware that abuses of the welfare system do exist, and we do not minimize the need to keep welfare expense within manageable bounds. We do not suggest that welfare payments should be made to anyone not entitled to receive them. We hold only that a welfare recipient is entitled to certain minimum procedural protections before his payments are cut off or diminished. Providing those protections will, of course, help to insure fair individual treatment. In addition, it will have the more subtle, but equally important, effect of demonstrating that fair procedures are available, thus protecting the rule of law in society, a not insignificant result.[45]

To sum up: We hold that a pre-termination hearing for welfare recipients is constitutionally required and that the procedures set forth above for such hearing are the constitutional minimum. Accordingly, we deny defendants' motion for summary judgment; we grant plaintiffs' motion for a preliminary injunction as to the operation of option (b), and deny it as to option (a), for the reasons and on the conditions stated herein. In addition, nothing herein is meant to affect the right to a post-termination hearing in accordance with the procedures already in existence. Plaintiffs also moved to dissolve an order of Judge Bryan's staying discovery pending disposition of the motions in chief. Since that discovery was primarily designed to prove that the various hearing procedures, even if constitutional on their face, were unconstitutional in their application, for the reasons already set forth we deny it. Plaintiffs' motion to amend the complaint in the consolidated

---

45. See E. Wickenden, Administration of Welfare Rights, in National Conference on Law and Poverty, Proceedings 31, 36–37 (1965).

case is granted, as is the motion of the twelve intervenors to intervene.

Settle order on notice; if defendants desire a stay pending appellate review, their proposed order should so provide.